IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRONE GREEN, | ) | Case No. 1:18-cv-93 |
| | ) | |
| Plaintiff | ) | |
| v. | ) | RICHARD A. LANZILLO |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| | ) | |
| SECRETARY WETZEL, et al., | ) | |
| | ) | MEMORANDUM OPINION AND ORDER |
| Defendants | ) | ON DEFENDANTS' MOTIONS FOR |
| | ) | SUMMARY JUDGMENT [ECF NOS. 107, |
| | ) | 111, and 117] |

MEMORANDUM OPINION AND ORDER

I.     Introduction

Plaintiff Tyrone Green initiated this action on March 21, 2018.  ECF No. 1.  In his complaint, filed on April 11, 2018, Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, alleging that the defendants, *inter alia*, violated his rights as secured by the United States Constitution during his incarceration at the State Correctional Institution at Albion (SCI-Albion).  ECF No. 5.[1]

In its prior Opinions deciding motions to dismiss filed by the Defendants, the Court identified fifteen claims raised in Plaintiff's complaint.  ECF No. 54 at 8-9.  Following the decisions on the motions to dismiss, ECF Nos. 54, 55, the following of those claims remain in the case (as originally numbered):[2]

1.   Retaliation and denial of medical care in violation of the First and Eighth Amendments stemming from Plaintiff's infirmary visit on August 9, 2017 (against Chuzie-McDowell, Stroup, and Halligan);

---

[1] The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

[2] The Court notes that no claim against named defendant Mental Health of America was identified.  The docket reflects that Mental Health of America was not served in this matter and no counsel entered an appearance on its behalf.  Defendant Mental Health of America is terminated from this case.

4.  Retaliation and cruel and unusual punishment in violation of the First and Eighth Amendments based on the cell transfer on August 31, 2017, (against Crum, Ruff, Deplatchet, Galbreathe, Sissem, Anderson, Adams, and Santos);

5.  Failure to protect in violation of the Eighth Amendment based on disregard of plaintiff's threats to harm himself if placed in Cell 31 (against Crum, Galbreathe, Adams, Anderson, Deplatchet, and Santos);

6.  Denial of medical care in violation of the Eighth Amendment based on failure to adequately treat Plaintiff's mental health condition (against Renberg);

7.  Excessive force in violation of the Eighth Amendment based on the August 31, 2017, incident in which Plaintiff was allegedly handcuffed and attacked (against Ruff, Crum, Arnold, and Diraimo);

8.  Denial of medical care in violation of the Eighth Amendment based on refusal to schedule follow-up appointments (against Smock, Halligan, and Deshantz);

9.  Denial of medical care in violation of the Eighth Amendment based on refusal to treat Plaintiff on September 11, 2017, (against Chuzie-McDowell);

11.  Lack of due process in violation of the Fourteenth Amendment based on the removal of Plaintiff's single-cell status (against Snider, Galbreathe, and Clark);

12.  Racial discrimination in violation of the Eighth Amendment based on the November 26, 2017, incident (against McClelland).

Defendants have filed three Motions for Summary Judgment. The Commonwealth Defendants (Santos, Galbreathe, Anderson, Adams, Kusiak,[3] Crum, Deplatchet, Ruff, Arnold, Diraimo, Sissem, Deshantz, Clark, Smock, Snider, and McClelland) seek summary judgment on Claims 4, 5, and 12.[4] ECF No. 107. The Court notes that the Commonwealth Defendants do not

---

[3] As the Commonwealth Defendants point out, defendant Kusiak remains in the case but Plaintiff asserts no claim against her. ECF No. 108 at 2 n.1; ECF No. 121 at 1-12 (Plaintiff's Response to Defendants['] Motion for Summary Judgment wherein he reiterates the Commonwealth Defendants against whom his claims are brought). Defendant Kusiak is therefore terminated from the case.

[4] In Plaintiff's Response to Defendants['] Motion for Summary Judgment, he states that he is no longer pursuing Claims 8 and 11. ECF No. 121 at 10. Plaintiff refers to these claims as Claim B and Claim C; however, it is clear from the context of his statements, as well as his failure to mount any defense to the motions for summary judgment on these claims, that Plaintiff has withdrawn Claims 8 and 11. These claims are dismissed, and Defendants Snider, Clark, Smock and Deshantz, who remained in the case only for one of these claims, are therefore terminated from the case.

seek summary judgment as to Claim 7, concerning excessive force in violation of the Eighth Amendment, brought against Ruff, Crum, Arnold, and Diraimo.  Accordingly, the case will proceed as to this claim regardless of the outcome of the instant motion for summary judgment. Defendant Renberg seeks summary judgment on Claim 6.  ECF No. 111.  The Medical Defendants (Halligan, Stroup, Chuzie-McDowell, and CCS) seek summary judgment on Claims 1 and 9.[5]  ECF No. 117.  The Court will address these motions in turn.

II.     Standard of Review

Federal Rule of Civil Procedure 56(a) requires a court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Id.* at 248; *Gray v. York Newspapers, Inc*., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am*., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

In determining whether a genuine issue of material fact remains for trial, the court must consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp*., 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co*., 862 F.2d

---

[5]  See footnote 1 concerning Plaintiff's withdrawal of Claim 8.

56, 59 (3d Cir. 1988).  To defeat a properly supported motion for summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings but must identify evidence that demonstrates the existence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Furthermore, the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The moving party may also rely upon the absence of evidence to support an essential element of the opposing party's claim as a basis for the entry of summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp*., 967 F.2d 846, 851 (3d Cir. 1992).

III.    Analysis

      A.    The Commonwealth Defendants' Motion for Summary Judgment

          1.    Claim 4: Retaliation and cruel and unusual punishment based on cell transfer (Crum, Ruff, Deplatchet, Galbreathe, Sissem, Anderson, Adams, and Santos)

This claim stems from Plaintiff's August 31, 2017, cell transfer.  The relevant undisputed facts regarding the transfer are as follows.  On August 31, 2017, Plaintiff was housed in FB-19 cell in general population at SCI-Albion.  ECF No. 109 ¶ 1; ECF No. 122 ¶ 1.  Cell 19 had two beds and Plaintiff had a Z-code (single-cell status).  ECF No. 109 ¶ 2; ECF No. 122 ¶ 2.  That day, Plaintiff was told he was to move to Cell 31.  ECF No. 109 ¶ 4; ECF No. 122 ¶ 10.  Plaintiff refused to do so and Psychological Services Specialist Miranda Galbreathe was called.  ECF No. 109 ¶ 5; ECF No. 122 ¶ 5.  Plaintiff told Galbreathe that he did not want to move to Cell 31 because, among other things, it was near the officers' desk.  ECF No. 109 ¶ 6; ECF No. 122 ¶ 6. Plaintiff threatened to take some action if he had to move to Cell 31.  ECF No. 109 ¶ 7; ECF No.

122 ¶ 7.  Plaintiff told Unit Manager Deplatchet that Cell 31 was dirty, so she inspected the cell. ECF No. 109 ¶ 11; ECF No. 122 ¶ 11.  Plaintiff was told that he could clean the cell after count was cleared.  ECF No. 109 ¶ 13; ECF No. 121 at 2.  Once in Cell 31, Plaintiff cut himself on the foot with a razor.  ECF No. 109 ¶ 16; ECF No. 110-1 at 116; ECF No. 121 at 4; ECF No. 122 ¶¶ 7, 23.  Consequently, officers removed Plaintiff from the unit.  ECF No. 109 ¶ 18; ECF No. 122 ¶ 18.

While he was off of the unit, Plaintiff did not harm himself.  ECF No. 109 ¶ 28; ECF No. 122 ¶ 28.  During this time, Plaintiff met with defendant Mental Health Coordinator Mary Beth Anderson who told him he could go back to his unit if he would agree to go to Cell 31.  ECF No. 109 ¶ 29; ECF No. 122 ¶ 29.  Plaintiff returned to Cell 31, where he cut himself again on September 5, 2017.  ECF No. 109 ¶ 31; ECF No. ¶ 31.

The parties dispute whether Cell 31 was dirty when Plaintiff was moved on August 31, 2017.  ECF No. 109 ¶ 12; ECF No. 122 ¶ 12.  Plaintiff avers that the cell "had urine and feces on the floor and along the toilet, and also had bloody bandages on the floor, and wasn't cleaned after the mentally ill inmate who lived there prior moved out."  ECF No. 146 ¶ 13.  The Commonwealth Defendants aver that there was nothing dirty about the cell and "there certainly were no feces or other filth."  ECF No. 109 ¶ 12.

In support of their motion for summary judgment as to Claim 4, the Commonwealth Defendants first assert that all defendants other than defendant Deplatchet, the Unit Manager who ordered Plaintiff's cell transfer,[6] are entitled to summary judgment for lack of personal involvement in the transfer.  ECF No. 108 at 9.  In response, Plaintiff states that all of the defendants named in this claim "were aware of the condition that 31 cell was in and none of the Defendants intervened."  ECF No. 121 at 1-2.  Even assuming that the other named defendants

---

[6]  The Commonwealth Defendants attach, *inter alia*, a declaration from Deplatchet attesting to her role in the cell transfer.  ECF No. 110-1 at 5.

were involved as Plaintiff asserts, that level of involvement is insufficient to support a claim for

liability under 42 U.S.C. § 1983.  As this Court has explained:

> In order to prevail on a claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995); *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005); 42 U.S.C. § 1983. Moreover, the plaintiff "must show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 U.S. Dist. LEXIS 65676, 2006 WL 2645154, at *3 (M.D. Pa. 2006) (quoting *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2006)). This means that each defendant must have played an "affirmative part" in the complained-of misconduct. [*Ashcroft v.*] *Iqbal*, 556 U.S. [662] at 677 [2009] ("In a § 1983 suit ... [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Oliver v. Beard*, 358 F. App'x 297, 300 (3d Cir. 2009). In the absence of specific allegations that a defendant played a role in depriving the plaintiff of a constitutional right, dismissal is appropriate. *See, e.g.*, *Mearin v. Swartz*, 951 F.Supp.2d 776, 781-82 (W.D. Pa. 2013) (dismissing claims pursuant to Rule 12(b)(6) because the plaintiffs had failed to set forth sufficient facts to establish that certain defendants had played an affirmative part in the alleged Eighth Amendment violation).

*Williams v. Pa. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 82106, at *10-11 (W.D. Pa. May 13, 2019).

In *Williams*, this Court found that a perfunctory averment that certain defendants became

aware of "matters" and failed to remedy them to be plainly insufficient to establish their personal

involvement.  *Id.* at *13.  Here, Plaintiff cannot rely on the mere presence and "awareness" of

defendants Crum, Ruff, Galbreathe, Sissem, Anderson, Adams, and Santos to establish that these

defendants played an affirmative part in transferring him to cell 31 when the evidence in the record

reflects that Deplatchet was the decisionmaker who ordered the transfer.  Thus, there is no support

for the instant § 1983 claim against them.  Accordingly, defendants Crum, Ruff, Galbreathe,

Sissem, Anderson, Adams, and Santos are entitled to judgment as a matter of law as to Claim 4.

The Court will next address the merits of Claim 4 as it relates to Deplatchet.

a.      Conditions of confinement

In order to succeed on an Eighth Amendment conditions of confinement claim, a plaintiff

must demonstrate both that he has been denied "the minimal civilized measure of life's necessities"

and that this was done while a defendant had a "sufficiently culpable state of mind." *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994).  As this Court has explained:

> "Because routine discomfort is part of the penalty that criminal offenders pay for
> their offenses against society, . . . only those deprivations denying the minimal
> civilized measure of life's necessities are sufficiently grave to form the basis of an
> Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995,
> 117 L. Ed. 2d 156 (1992).  An Eighth Amendment conditions of confinement claim
> exists where "viewing the totality of the conditions in the prison, the inmate's
> conditions of confinement, alone or in combination, deprive him of the minimal
> civilized measure of life's necessities." *Tillery v. Owens*, 907 F.2d 418, 426-27 (3d
> Cir. 1990).  In the non-medical context, this means that prison officials must
> provide adequate food, clothing, shelter, and medical care, and "take reasonable
> measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517,
> 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).

*Simmons v. Overmyer*, 2019 U.S. Dist. LEXIS 221399, at *22-23 (W.D. Pa. Dec. 27, 2019).

The Commonwealth Defendants argue that no Eighth Amendment violation occurred in

this instance because even if, on August 31, 2017, Cell 31 was in the state Plaintiff describes, he

was offered cleaning supplies to rectify the condition and, further, Plaintiff stayed only a short

time in the cell.  ECF No. 108 at 9.  Plaintiff does not offer any specific response to this argument.

As set forth above, the parties dispute the state of Cell 31's cleanliness on August 31, 2017.

But even assuming that the cell was in the unsanitary state that Plaintiff claims, no constitutional

violation could have arisen in the very limited time he was housed in the cell.  As the United States

Court of Appeals for the Third Circuit has explained,

> In determining whether the conditions of confinement amount to a constitutional
> violation, the "'circumstances, nature, and duration' of the conditions must be
> carefully considered" but the "length of exposure . . . is often of prime importance."
> *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (citation omitted); *see Hutto
> v. Finney*, 437 U.S. 678, 686-87, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) ("A filthy,

> overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months."); *see also Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) ("the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases").

*Martin v. Gearhart*, 712 Fed. Appx. 179, 186-87 (3d Cir. 2017).

The undisputed facts show that Plaintiff began cutting himself almost immediately upon his move to Cell 31 and was removed from the cell upon prison officers' observation of the cutting. While the precise length of time cannot be ascertained from the record, it is clear that Plaintiff was in Cell 31 for a very minimal time, most certainly less than one day. The alleged constitutional violation could not have occurred under these circumstances. *See Bracey v. Price*, 2012 U.S. Dist. LEXIS 170940, at *47-48 (W.D. Pa. Dec. 3, 2012) (finding no sufficiently serious deprivation where, for three days, inmate had no water in cell, toilet in his cell contained feces, inmate was exposed to the smells of feces and urine and was deprived of bedding and cleaning materials). Because no constitutional deprivation occurred, Deplatchet is entitled to judgment as a matter of law on this portion of Claim 4.

b.  Retaliation

As this Court has explained:

> In order to establish illegal retaliation for engaging in protected conduct, a plaintiff must allege that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser* v. *Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). A plaintiff must also allege a causal link between protected conduct and the adverse action taken against him. A causal link is established when the protected conduct "was a substantial or motivating factor in the decision to discipline [a plaintiff]." *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002).

*Williams v. Clark*, 2020 U.S. Dist. LEXIS 1952, at *13 (W.D. Pa. Jan. 7, 2020).

The Commonwealth Defendants also argue that Deplatchet is entitled to judgment as a matter of law on the retaliation portion of Claim 4.  They assert, *inter alia*, that Plaintiff has failed to produce any evidence of the requisite causal link between constitutionally protected conduct and alleged retaliatory action.  Specifically, they cite Plaintiff's deposition testimony that he did not know why he was transferred to Cell 31.  ECF No. 108 at 12.  Indeed, Plaintiff testified that he did not know the cause of the cell transfer, and that he needed to do "further research of the evidence."  ECF No. 110-1 at 190.  However, Plaintiff has not, as is required at this stage of the case, put forward anything more than conclusory statements that all of the defendants knew of his prior litigation and took every subsequent action concerning Plaintiff in retaliation for that litigation.  In his response to the motion for summary judgment, Plaintiff does not point to any evidence of a causal link between his lawsuit and Deplatchet's order for a cell transfer.  Because Plaintiff has failed to offer evidence to support this essential element of his retaliation claim, Deplatchet is also entitled to judgment as a matter of law on this portion of Claim 4.

2.      Claim 5: Failure to protect (Crum, Galbreathe, Adams, Anderson, Deplatchet, and Santos)

This claim is based on the named defendants' failure to protect Plaintiff from being placed in Cell 31 on both August 31, 2017, and September 5, 2017, thus allegedly disregarding the known risk of Plaintiff harming himself.

A prison official cannot be found liable under the Eighth Amendment for failing to protect a prisoner "unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Further, an "out-of-the-blue and unadorned 'I'm-in-trouble' entreaty" is inadequate to sustain an Eighth Amendment claim.  *Bistrian v. Levi*, 696 F.3d 352, 369-70 (3d Cir. 2012).

The Commonwealth Defendants move for summary judgment on this claim on multiple bases. First, they argue that plaintiff has failed to produce evidence that any of the named defendants disregarded a substantial risk of serious harm to Plaintiff by placing him in Cell 31. ECF No. 108 at 8. In response, Plaintiff cites to evidence of his long history of self-harm and to statements he made threatening self-harm if he were to be moved to Cell 31. ECF No. 121 at 3-4, 8.

As to Plaintiff's threats, there is evidence in the record of the following. At his deposition, Plaintiff testified that he told Deplatchet and Ruff that if he was put in Cell 31, "I'm cutting." ECF No. 110-1 at 168. In his Affidavit filed in response to the motions for summary judgment, Plaintiff states that he informed Crum that he would "begin to harm himself" if he was moved to Cell 31. ECF No. 146 ¶ 13. He also states that he told Galbreathe "of his intentions" if he was moved. *Id.* ¶ 15. These threats were made before the August 31, 2017 move to Cell 31. Plaintiff further states that before he was returned to Cell 31 on September 5, 2017, he informed Anderson that if he were put back in Cell 31, he would harm himself. *Id.* There is no evidence to establish that the other defendants named in this claim, Adams and Santos, knew of any of Plaintiff's threats of self-harm. Accordingly, Adams and Santos cannot be liable for failing to protect Plaintiff from such self-harm.

Plaintiff does not offer any evidence showing that prior to the August 31, 2017 move to Cell 31 any of the named defendants were aware of his long history of self-harm; therefore, that factual assertion cannot be used not bolster his claim. Thus, the record does not support a finding that Plaintiff's threats were other than the "out-of-the-blue and unadorned 'I'm-in-trouble'" entreaties that are inadequate to sustain an Eighth Amendment claim. Further, the record does not support an inference that any defendant acted with deliberate indifference to Plaintiff's threat of

self-harm.  As the Third Circuit has acknowledged, "when inmates claim they are in danger, they confront prison officials with an 'arduous task.'" 696 F.3d at 369 (quoting *Young v. Quinlan*, 960 F.2d 351, 363 n. 23 (3d Cir.1992)). "'[P]risoners may feign their fear of physical harm simply to manipulate a transfer,' in the hope, for example, of obtaining more desirable living arrangements." *Id.* (quoting *Young*, 960 F.2d at 363 n. 23 (additional internal quotation marks omitted)).  The dilemma faced by correctional officers is particularly challenging where an inmate seeks or resists a transfer or other action by threatening self-harm.  Certainly, threats of self-harm may represent a genuine manifestation of mental illness or distress requiring an appropriate response.  But a threat of self-harm also may represent an attempt to manipulate a situation or secure a desired outcome. Faced only with Plaintiff's spontaneous threats of self-harm in response to a cell transfer, it cannot be said that Deplatchet, Ruff, Crum or Galbreathe acted with deliberate indifference in allowing the transfer to proceed.  This is particularly so given the absence of evidence to support that Plaintiff was not properly supervised following his threats or that prison personnel did not respond appropriately to his self-injury.  Accordingly, defendants Deplatchet, Ruff, Crum and Galbreathe, who, at best, knew only of Plaintiff's spontaneous threats to harm or cut himself if he was unable to deter his cell transfer, cannot be liable for failing to protect him from the threatened harm.

As to defendant Anderson, she had knowledge at least of Plaintiff's August 31, 2017, incident of self-harm.  However, the evidence of record establishes that Anderson did not perceive Plaintiff's actions in that incident to be indicative of any risk of actual harm.  In her declaration, Anderson states that she consulted with a psychiatrist as to Plaintiff's case and she spoke to Plaintiff while he was in a psychiatric observation cell.  ECF No. 110-1 at 11.  She told Plaintiff that he could go back to his unit if he agreed to move to Cell 31, "as it was obvious to the treatment team that this was not a suicide attempt but was done for secondary gain.  He all but stated he cut

himself because he did not want to move into 31 cell." *Id.* at 11-12.  Plaintiff refused to return to

Cell 31 at that time.  *Id.* at 12.  Anderson met with Plaintiff again, at which time, she recorded,

Plaintiff stated that he would go back to Cell 31 "and that he had no intentions to harm himself."

*Id.*  Anderson further states, "[i]t is my conclusion as a mental health professional that he cut

himself both times [August 31, 2017, and September 5, 2017] for secondary gain and not for any

mental health reason or because he was suicidal."  *Id.*  Given this uncontroverted evidence as to

Anderson's state of mind in the relevant time period, Plaintiff cannot show that Anderson actually

drew an inference from the facts she knew that a substantial risk of serious harm existed in

returning Plaintiff to Cell 31.  Instead, the record reflects that Anderson exercised her professional

judgment and concluded that, notwithstanding his threats and history, Plaintiff's return to Cell 31

would not place him at a substantial risk of serious harm.  Accordingly, Anderson is not liable for

this claim.  The Commonwealth Defendants are entitled to judgment as a matter of law as to

Claim 5.

### 3.    Claim 12: Racial discrimination (McClelland)

Plaintiff's racial discrimination claim arises from an incident in which Officer McClelland

issued Plaintiff a misconduct based on his possession of a typewriter belonging to another inmate

named O'Hara.  The undisputed facts show that McClelland issued Misconduct C130829 to

Plaintiff on November 29, 2017 for possession of contraband and loaning or borrowing property,

specifically, the typewriter and ink cartridge belonging to another inmate.  ECF No. 109 ¶ 59; ECF

No. 122 ¶ 59.  The misconduct was referred for informal resolution, but Plaintiff refused an

informal sanction, so the matter went before a hearing examiner.  ECF No. 109 ¶ 60; ECF No. 122

¶ 60.  Plaintiff pled guilty to the misconduct and the contraband was revoked.  ECF No. 109 ¶ 61;

ECF No. 122 ¶ 61.

The parties dispute the reason that Plaintiff received a misconduct when O'Hara did not. The Commonwealth Defendants assert that there was no evidence to support a misconduct against O'Hara, who denied that he had loaned the typewriter to Plaintiff.  ECF No. 109 ¶ 62.  Plaintiff disputes that O'Hara denied loaning Plaintiff the typewriter and further asserts that McClelland stated that O'Hara did not receive a misconduct because "O'Hara doesn't file grievances like you, and us white guys have to stick together."  ECF No. 122 ¶ 62.

Plaintiff claims that he was denied his constitutional right to equal protection because McClelland treated him differently on the basis of his race, *i.e.*, he issued Plaintiff a misconduct because he is black but did not issue O'Hara a misconduct because he is white.  ECF No. 121 at 10-12.[7]  The Commonwealth Defendants argue that McClelland is entitled to judgment as a matter of law on this claim because: (1) Plaintiff's plea of guilty to the misconduct belies any illegitimacy in its issuance; and (2) Plaintiff and O'Hara were not similarly situated from an evidentiary standpoint.  ECF No. 108 at 16.

As to the first argument, while the Court is aware that a finding of guilt on or a plea of guilty to a misconduct may foreclose certain claims related to the misconduct,[8] the Commonwealth Defendants have not provided any legal authority to support their premise that a claim of racial discrimination is so foreclosed.  Further, the Commonwealth Defendants' bald assertion that Plaintiff's plea of guilty is an admission that the misconduct was not motivated by racial animus is belied, at least at this stage of the case, by the evidence that Plaintiff has proffered of McClelland's statement which directly expresses racial animus.  The Court finds that a genuine

---

[7]  This Court previously characterized Claim 12 as a claim pursuant to the Eighth Amendment, ECF No. 54 at 9; however, in litigating the instant motion for summary judgment, the parties treat this claim as an equal protection claim pursuant to the Fourteenth Amendment.  The Court has done so as well.

[8]  *See e.g., Romansky v. Stickman*, 147 F. App'x 310, 312 (3d Cir. 2005) (holding that issuance of a misconduct cannot be considered retaliatory where the inmate ultimately pleads or is found guilty of the offense).

issue of material fact exists as to McClelland's motivation for the differences in his disciplinary treatment of Plaintiff and O'Hara.

As to the Commonwealth Defendants' second argument, the United States Court of Appeals for the Third Circuit has held:

> To establish a § 1983 claim, a plaintiff must prove that a defendant's discriminatory action was purposeful:
>
> > To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'
>
> *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal citations omitted). …
>
> We also have explained that "[a]n essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were 'similarly situated.' Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (citing *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)).

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014).

When viewed in the light most favorable to Plaintiff, the evidence shows that while the Plaintiff and O'Hara performed different acts, *i.e.*, loaning versus borrowing a typewriter, their acts stemmed from a single agreement and, at least is part, violated the same regulation, *i.e.*, loaning or borrowing property.  Thus, the Court finds that there is a genuine question of material fact as to whether Plaintiff and O'Hara were similarly situated.

For these reasons, McClelland is not entitled to judgment as a matter of law on Claim 12.

B.     Defendant Renberg's Motion for Summary Judgment

     1.     Claim 6: Denial of medical care for mental health

Defendant Ingrid Renberg, M.D., a psychiatrist, moves for summary judgment on the sole claim against her, a claim that she was deliberately indifferent to Plaintiff's serious medical needs

in violation of the Eighth Amendment.  ECF No. 111.  The claim against her stems from Renberg's treatment of Plaintiff from September 5, 2017 to September 7, 2017.

The relevant undisputed facts are as follows.  Years prior to 2017, Plaintiff suffered sensory loss in his right foot.  ECF No. 113 ¶ 4; ECF No. 138 ¶ 4.[9]  On September 5, 2017, Renberg was aware of Plaintiff's loss of sensation to his right foot.  ECF No. 113 ¶ 5; ECF No. 138 ¶ 5.[10]  On September 5, 2017, Plaintiff was brought to the medical department at SCI-Albion and assessed by a nurse for a self-inflicted cut to his right ankle.  ECF No. 113 ¶ 7; ECF No. 138 ¶ 7.  The cut was determined to be superficial and uncomplicated and the bleeding was controlled with pressure.  ECF No. 113 ¶ 8l ECF No. 138 ¶ 8.[11]  Plaintiff was subsequently placed in the psychiatric observation cell ("POC"), a restricted setting used only for inmates who could potentially be suicidal or who are experiencing serious mental health needs.  ECF No. 113 ¶ 11; ECF No. 138 ¶ 11.  Psychology recommended that Plaintiff be discharged from the POC after determining that Plaintiff's actions were the result of his unhappiness with his assigned cell.  ECF No. 113 ¶ 14; ECF No. 138 ¶ 14.  Renberg assessed Plaintiff in person.  ECF No. 113 ¶ 15; ECF No. 138 ¶ 15.  Plaintiff told Renberg that he was unhappy with his assigned cell and wanted to be moved to another one.  ECF No. 113 ¶ 16; ECF No. 138 ¶ 16.  Based on her evaluation of Plaintiff, the information provided to her by the staff observing Plaintiff and information Plaintiff provided to her, Renberg determined that Plaintiff was neither suicidal nor experiencing a serious mental

---

[9]  Plaintiff filed two Responses to Defendant Renberg's Concise Statement of Facts: ECF Nos. 131 and 138.  They appear to be identical.  The Court will cite only to ECF No. 138.  Further, Plaintiff filed two Responses to Defendant Renberg's Motion for Summary Judgment: ECF Nos. 132 and 137.  They also appear to be identical.  The Court will cite only to ECF No. 137.

[10]  The Court notes that Plaintiff nominally disputes this fact, ECF No. 138 ¶ 5; however, he appears to dispute the source of Renberg's knowledge, not the existence of it.

[11]  Again, Plaintiff "disputes" this fact, but he does not dispute that the cut was determined to be superficial; he disputes that it was actually superficial.  ECF No. 138 ¶ 8.

health need.  ECF No. 113 ¶ 17; ECF No. 138 ¶ 17.  Renberg determined that Plaintiff should not

remain in the POC.  ECF No. 113 ¶ 21; ECF No. 138 ¶ 21.  After Plaintiff spent more than 13

hours under close observation in the POC, Renberg discharged him, placed him on razor restriction

so he could not harm himself and continued his medications.  ECF No. 113 ¶ 22; ECF No. 138

¶ 22.  Plaintiff was referred to psychology after he cut himself and was seen the following day.

ECF No. 113 ¶ 29; ECF No. 138 ¶ 29.  He presented with no safety issues and his unit team was

made aware of his behaviors.  *Id.*  Renberg evaluated Plaintiff again on September 7, 2017.  ECF

No. 113 ¶ 30; ECF No. 138 ¶ 30.  She noted that Plaintiff had been cutting the foot with diminished

sensation and determined that his conduct was highly suspicious for embellishment for secondary

gain.  ECF No. 113 ¶ 31; ECF No. 138 ¶ 31.[12]  She discontinued Plaintiff's medications based on

Plaintiff's refusal to take them and his non-compliance with the medication order.  ECF No. 113

¶ 32.[13]  Renberg ensured that Plaintiff knew how to access mental health services and scheduled

him for a follow-up appointment; she further noted that both psychology and psychiatry were

monitoring Plaintiff and trying to work with him but were meeting with resistance.  *Id.* ¶¶ 34-35.[14]

The Eighth Amendment "requires prison officials to provide basic medical treatment" for

incarcerated persons.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citation omitted). To

establish an Eighth Amendment claim based on inadequate medical care, a plaintiff must show "(i)

a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate

indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Thus, to survive summary judgment on a claim brought under 42 U.S.C. § 1983 alleging that prison

---

[12]  Plaintiff disputes Renberg's determination that he was embellishing.  ECF No. 138 ¶ 31.

[13]  Plaintiff disputes this fact on a non-specified basis.  ECF No. 138 ¶ 32.  His brief indicates that he does not dispute that the medications were discontinued or that he was not taking his medication.  ECF No. 137 at 2, 3.

[14]  Plaintiff disputes these facts on non-specified bases, ECF No. 138 ¶¶ 34-35, but the medical records support the characterization of Renberg's notes.  ECF No. 114-14 at 3.

officials have violated the Eighth Amendment rights of an inmate, that inmate must (1) show that his medical condition is "objectively, sufficiently serious" and (2) show that the defendant acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834; *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse*, 182 F.3d at 197). The subjective inquiry aspect of deliberate indifference is meant "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

In support of her motion for summary judgment, Renberg asserts that: (1) there is no evidence that Plaintiff suffered a serious mental health need on September 5, 2017; (2) there is no evidence that Renberg was deliberately indifferent to Plaintiff's needs; and (3) there is no evidence that Plaintiff suffered from a particular vulnerability to suicide on September 5, 2017. ECF No. 112 at 5-8. In short, Renberg argues that she acted promptly and appropriately after learning that Plaintiff cut himself and that there is no evidence which demonstrates otherwise.

In response, Plaintiff asserts that a reasonable jury could believe that Plaintiff was experiencing a serious mental health need on September 5, 2017 and that he had a particular vulnerability to suicide or self-harm. Plaintiff also argues that the record also could support a finding that from September 5, 2017 to September 7, 2017, Renberg was deliberately indifferent to Plaintiff's medical needs because: (1) she released him from the POC 13 hours after he cut himself; and (2) she discontinued his medication without follow-up care. ECF No. 137 at 6.

Even assuming for purposes of analysis that Plaintiff's cutting incident on September 5, 2017 constituted or evidenced a serious mental health need, Plaintiff has failed to show that Renberg acted with deliberate indifference in her subsequent treatment of him.

As this Court has explained:

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle [v. Gamble]*, 429 U.S. [97] at 104 [1976]. This indifference can manifest in an intentional refusal to provide care, in delaying medical treatment for non-medical reasons, in the denial of prescribed medical treatment or reasonable requests for treatment that result in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). Deliberate indifference can also be found where prison medical personnel continue with "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

When it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of scienter can be proven through circumstantial evidence and witness testimony. *Id.* But "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Furthermore, courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

That said, as the Court of Appeals has made clear, the fact that prison medical personnel have provided some medical care to an inmate does not preclude a finding of deliberate indifference:

[T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017).

*Lewis v. Wexford Health Sources, Inc.*, 2019 U.S. Dist. LEXIS 50138, at *18-20 (W.D. Pa. Mar. 26, 2019).

Plaintiff asserts his disagreement with Renberg's treatment of him on the following bases: (1) she released him from the POC too early; and (2) she should not have discontinued his medication without follow-up treatment. As to the "early" release from the POC, it is undisputed that Renberg maintained Plaintiff under close psychiatric observation for 13 hours during which he was without incident. This period of assessment and Renberg's ultimate decision that it was safe to return Plaintiff to his unit after the assessment represents a level of care and exercise of professional judgment that foreclose a finding of deliberate indifference. *See Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (citations omitted) (describing deliberate failure to provide adequate care as basis for Eighth Amendment claim). As to the discontinuation of medication, Plaintiff does not dispute that he had already discontinued his medication by refusing to take it. Further, although Plaintiff claims that the record is devoid of any follow-up treatment from Renberg within 60 days of September 7, 2017, the same is not evidence that Renberg herself failed to follow up.

In any event, in general, a disagreement about the medical treatment provided to a prisoner does not rise to the level of a constitutional violation. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). To show that Renberg acted with a "sufficiently culpable state of mind," Plaintiff must produce evidence establishing that Renberg knew of a serious risk to his health and consciously disregarded that risk. *See*, *e.g.*, *Wilson v. Jin*, 698 Fed. Appx. 667, 671 (3d Cir. 2017) (quoting *Rouse*, 182 F.3d at 197) (deliberate indifference "requires obduracy and wantonness ... which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk."). He has not done so. Instead, the undisputed facts reveal that on September 5, 2017, in response to his

act of self-harm, Plaintiff was placed in the POC for more than 13 hours. There, Renberg conducted an in-person evaluation of Plaintiff and received reports from the staff who had observed Plaintiff in the POC. Based on the information before her, Renberg discharged Plaintiff from the POC. She restricted him from possessing a razor, which had been the instrument of his self-harm. She continued his medications and he was referred to the psychology department. Renberg re-evaluated Plaintiff on September 7, 2017, and, at that time, discontinued his medications due to his non-compliance in taking them. Further, her notes indicate that although she found that Plaintiff was not suffering from any acute problems, she ensured he knew how to access mental health services and scheduled him for a follow-up appointment. These facts regarding the care provided by Renberg, viewed in the context of the totality of the record, preclude a finding of an Eighth Amendment violation. Accordingly, Renberg is entitled to judgment as a matter of law on Claim 6.

      C.      The Medical Defendants' Motion for Summary Judgment

           1.      Claim 1: Retaliation and denial of medical care stemming from Plaintiff's infirmary visit on August 9, 2017 (Chuzie-McDowell, Stroup, and Halligan)

Claim 1 concerns Plaintiff's medical care beginning on or about August 9, 2017, primarily related to Plaintiff coughing up blood. As to this claim, the Medical Defendants contend, *inter alia*, that Plaintiff did not properly exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

The PLRA's exhaustion provision states: "No action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is a "threshold issue that *courts* must address to

determine whether litigation is being conducted in the right forum at the right time [,]" and must "be determined by a judge, even if that determination requires the resolution of disputed facts." *Small v. Camden Cty.*, 728 F.3d 265, 269-70 (3d Cir. 2013) (citations omitted) (emphasis in original). Failure to exhaust is an affirmative defense that must be pleaded and proven by the defendants; it is not a pleading requirement for the prisoner-plaintiff. *Jones v. Bock*, 549 U.S. 199, 212 (2007).

To properly exhaust administrative remedies under the PLRA, "prisoners must complete the administrative review process in accordance with the applicable procedural rules, rules that are defined not by the PLRA, but by the prison grievance process itself." *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (internal quotations and citations omitted). Courts do not have discretion to decide whether exhaustion should be excused, *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), and there is no exception to the exhaustion requirement based on "futility." *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

Relevant to these proceedings is the official Inmate Grievance System of the Pennsylvania Department of Corrections ("DOC"), which is governed by Administrative Directive 804 ("DC-ADM 804"). The grievance process provided therein consists of three steps: (1) initial review by a Grievance Officer of an inmate grievance; (2) appeal to the Facility Manager to review the decision of the Grievance Officer; and (3) final review or appeal to the Secretary's Office of Inmate Grievance Appeals ("SOIGA") to review the decision of the Facility Manager. *See* DC-ADM 804 (April 27, 2015); *see also Smith v. Sec'y of the Pa. Dep't of Corr.*, 747 Fed. Appx. 101, 103-104 (3d Cir. 2018) (discussing the three-step grievance process set forth in DC-ADM 804). "Section 2 - Appeals" of DC-ADM 804, which dictates "Inmate Responsibilities" in an Appeal to Final Review, is of particular relevance to this case. It provides that each appeal must, *inter alia*,

"contain reason(s) for appealing the Facility Manager/designee's decision."   DC-ADM 804 § 2.B.1.e.5.

On August 12, 2017, Plaintiff submitted Grievance Number 691610, in which he described the treatment he had received for the problems he was having with blood in his spit, *i.e.*, the basis for Claim 1.  ECF No. 118-2 at 77.  That grievance was denied on the basis that Plaintiff had been evaluated for this problem on August 11, 2017, following which he had an x-ray of his lungs which indicated possible bronchitis for which he was prescribed an antibiotic and a follow-up x-ray.  *Id.* at 78.  Plaintiff appealed that determination.  *Id.* at 79.  The appeal was initially remanded to address a corollary issue concerning preservation of video of Plaintiff spitting blood, but the video was ultimately determined to be unavailable.  *Id.* at 80-81.  Plaintiff again appealed.  *Id.* at 82.  In this appeal, Plaintiff stated merely, "I stand by my initial grievance and the facts therein."  *Id.*  That appeal was dismissed because Plaintiff offered "nothing additional to confront the decision of the Grievance Officer."  *Id.* at 83.  Plaintiff filed a final appeal in which he stated only "I stand by the Facts in my grievance!"  *Id.* at 84.  SOIGA dismissed that appeal, finding that an appeal to final review was not permitted because Plaintiff had failed to comply with submission procedures.  *Id.* at 76.  Specifically, the Chief Grievance Officer explained, "you offer no appeal points as required by the DC ADM 804. … Due to this, your appeal to this office is dismissed."  *Id.*

There is no dispute that Plaintiff's grievance as to this claim was deemed by SOIGA to be noncompliant with the applicable grievance procedure.  However, Plaintiff argues that his noncompliance does not mean he failed to exhaust his administrative remedies.  He first asserts that because the Superintendent's response (in the intermediate appeal) was late, the "administrative remedy" was not available to him.  ECF No. 121 at 20.  This argument is unavailing.  The response was timely.  The appeal was received by the Superintendent/Facility

Manager on October 6, 2017, and responded to on October 30, 2017. ECF No. 118-2 at 83. Section 2.A.2.d. of DC-ADM 804 provides that the Facility Manager shall notify the inmate of his/her decision within 15 working days of receiving the appeal. Working days are defined in DC-ADM 804 as "Monday through Friday, excluding state holidays." DC-ADM 804, Inmate Grievance System Procedures Manual Glossary of Terms. Counting the Columbus Day holiday, which fell on October 9, 2017, as a non-working day, October 30, 2017, was the 15th working day after the appeal was received.

Plaintiff also argues that, when his final appeal was dismissed, "he was not given instructions to re-file the grievance as he was in [another grievance], nor was he told of a procedural default." ECF No. 121 at 20. As is indicated in the Final Appeal Decision Dismissal, Chief Grievance Officer checked the box marked "An appeal to final review is not permitted when you fail to comply with submission procedures," and she explained, "you offer no appeal points as required by the DC ADM 804. … Due to this, your appeal to this office is dismissed." ECF No. 118-2 at 76. Plaintiff was clearly told of his procedural default. No corrective instructions were required.[15] Plaintiff failed to properly exhaust his administrative remedy as to Claim 1. Thus, he cannot obtain relief in this Court thereupon. Judgment as a matter of law is granted to Chuzie-McDowell, Stroup, and Halligan as to Claim 1.

---

[15] It is noteworthy that even after having the intermediate and final appeals on this grievance found to be deficient on the basis that Plaintiff merely relied on the facts in his grievance, he has continued to pursue grievance appeals in this manner, with the same result. *See* ECF No. 118-2 at 1 (Chief Grievance Officer denied final appeal of Grievance Number 708139 stating, "You failed to include reasons for appealing the facility manager's decision. Therefore your appeal is dismissed."); 8 (Chief Grievance Officer denied final appeal of Grievance Number 701935, stating, "Review by this office determined that your appeal to the facility manager was appropriately dismissed. In addition, your appeal to final review fails to provide reason(s) for appealing the facility manager's appeal response.); 70 (Chief Grievance Officer denied final appeal of Grievance Number 694294, stating "Per the DC ADM 804, Section 2, an appeal to final review must contain reason(s) for appealing the Facility Manager/designee's decision. You have failed to include any appeal points; therefore, your appeal to this office is dismissed."). Thus, the suggestion that Plaintiff would have corrected the problem had it been better explained to him has not been borne out by his subsequent actions.

2.      Claim 9: Denial of medical care for September 11, 2017 (Chuzie-McDowell)

Claim 9 concerns a medical visit that Plaintiff had on September 11, 2017, primarily related to his complaints of headaches. The Medical Defendants contend, *inter alia*, that Plaintiff did not exhaust this claim as required by the PLRA because the relevant grievance, Grievance Number 696006, was not properly exhausted at the final appeal stage. ECF No. 118 at 18-21.

At that stage, SOIGA filed Plaintiff's final appeal on this grievance without further action because Plaintiff failed to include a copy of the Superintendent's response to his intermediate appeal. ECF No. 118-2 at 57. Plaintiff indicated to SOIGA that he had not received a copy of the Superintendent's response.[16] *Id.* at 55. SOIGA notified Plaintiff again of its intent to file his final appeal without further action, stating that if he did not have the response, he could request once from the Facility Grievance Coordinator. *Id.* at 53. The Medical Defendants assert that Plaintiff did not submit anything further to SOIGA. ECF No. 118 at 19. Plaintiff asserts that he "tried to get this unknown response from the superintendent but was unable." ECF No. 121 at 21. Plaintiff does not provide any further explanation or support for this assertion.

While it is undisputed that Plaintiff did not submit the required documents to obtain final review of this grievance,[17] it is the Facility Manager/designee's responsibility to notify the inmate of the appeal response, DC-ADM 804 § 2.A.2d. There is no evidence that such a notification was made. Although Plaintiff may have been able to obtain a copy of the response by request, it was not his responsibility to do so. The prison's failure to comply with its responsibility rendered any administrative remedy unavailable to Plaintiff. *See Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d

---

[16] Plaintiff acknowledged receipt only of an informal response to his grievance, dated September 25, 2017. ECF No. 118-2 at 54-55. SOIGA sought a copy of the final response, issued on October 18, 2017. *Id.* at 53.

[17] DC-ADM 804 requires an inmate appealing a grievance to final review to provide SOIGA with all required and relevant documentation, including a copy of the Facility Manager/designee's decision. DC-ADM 804 § 2.B.1.j.

Cir. 2019) (holding that just as the PLRA requires prisoners to comply with the procedural demands of a system created by their jailors, prisons must also comply with the demands of that system).  Thus, the Court does not find that failure to exhaust precludes relief on this claim.

The undisputed facts concerning this claim are that on September 11, 2017, Plaintiff was seen by Cyndi Chuzie-McDowell, CRMP, complaining of headaches all day, every day.  ECF No. 119 ¶ 32; ECF No. 122 ¶ 32.  Chuzie-McDowell asked Plaintiff questions about the frequency of the headaches and what he had been doing to try to relieve them.  *Id.*  After a tense exchange with Plaintiff, Chuzie-McDowell told Plaintiff to leave.  *Id.*

The parties dispute the reason for the tense exchange prior to Chuzie-McDowell's request for Plaintiff to leave.  Plaintiff asserts that when he walked into the appointment, Chuzie-McDowell was looking at the "legal section" of Plaintiff's medical file which induced hostility towards Plaintiff.  ECF No. 5 at 13-14; ECF No. 121 at 18; ECF No. 111 ¶ 32.  Plaintiff describes this section as a "litigation/legal section with pending and prior civil actions against medical and prison staff which informs, provokes, and encourages … deliberate indifferent conduct…."  ECF No. 146 at 11.  Plaintiff said that when he sat down, Chuzie-McDowell began to get very sarcastic with Plaintiff, acting as if every response he gave was stupid.  ECF No. 121 at 18.  Plaintiff asked her what was wrong and she told him to get out.  *Id.*

The Medical Defendants assert that when Chuzie-McDowell attempted to question Plaintiff about his headaches, he asked her if she was going to diagnose him or treat him and why she was asking so many questions.  ECF No. 188 at 9-10; ECF No. 119 ¶ 32.  He then stated, "God, what's wrong with you!" and said that he had headaches and shoulder pain because of assaults by prison staff and that he shouldn't have to pay a co-pay.  *Id.*  He then became aggressive

and upset and, noting that he possessed a cane, Chuzie-McDowell asked him to leave. *Id.* He said, "you should have just said that at first," and left abruptly. *Id.*

The Medical Defendants argue that the reason that Chuzie-McDowell did not treat Plaintiff on September 11, 2017 was not deliberate indifference, but instead was Plaintiff's belligerent behavior, which caused Chuzie-McDowell to be fearful for her safety. ECF No. 118 at 10. In support of their motion, the Medical Defendants proffer Plaintiff's medical records of the subject visit and an affidavit from Chuzie-McDowell describing the visit. ECF No. 118-1 at 27-28; ECF No. 145-1. This evidence supports the version of events described by the Medical Defendants. This evidence additionally indicates that after Plaintiff left the exam room, Chuzie-McDowell was so concerned for her safety that she called a Corrections Officer to confirm that Plaintiff had fully exited the medical department before she left the exam room. ECF No. 118-1 at 27-28; ECF No. 145-1 at 2-3. Further, in her affidavit, Chuzie-McDowell disputes Plaintiff's assertion that she was looking at the "legal section" of his medical file. ECF No. 145-1 at 2. She states that she was not doing so and that to her knowledge, there is no legal section in any patient-inmate's medical chart. *Id.* Finally, the Medical Defendants point to multiple indications in Plaintiff's medical record in which staff noted that Plaintiff became hostile, antagonistic, or belligerent in other interactions with medical staff. ECF No. 144 at 7. In contrast, Plaintiff does not point to any evidence to support the assertion that a "legal/litigation section" exists in his medical records. Plaintiff relies solely on his interpretations of Chuzie-McDowell's actions which are based on his subjective perceptions and not supported by any specific evidence.

As set forth above, in order to survive summary judgment on a claim brought under 42 U.S.C. § 1983 alleging that prison officials have violated the Eighth Amendment rights of an inmate, that inmate must (1) show that his medical condition is "objectively, sufficiently serious"

and (2) show that the defendant acted with a "sufficiently culpable state of mind." *Farmer*, 511

U.S. at 834; *see also Pearson*, 850 F.3d at 534 (quoting *Rouse*, 182 F.3d at 197).

The Medical Defendants do not argue that Plaintiff did not suffer a serious medical need.

They focus instead on Plaintiff's failure to establish deliberate indifference on the part of Chuzie-

McDowell. Because the Medical Defendants argue that Chuzie-McDowell failed to treat Plaintiff

due to safety concerns, the following law is instructive.

> Where, as here, a deliberate indifference claim involves "competing institutional concerns," namely prison security and discipline, courts must apply the deliberate indifference standard "in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns." *Trammell v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003). Such cases "occasion no exception to the rule that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 163 (citing *Bell v. Wolfish*, 441 U.S. 520, 547, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979)) (internal quotation marks omitted). In *Trammell*, a case involving an inmate who was subjected to a deprivation order as a result of misbehavior, the Circuit Court stated:
>
>> Consequently, we ask not simply whether the [deprivation order] was imposed with "deliberate indifference" to Trammell's health and safety, for it is undisputable that the Order was intended to make Trammell uncomfortable in an effort to alter his behavior. Rather, we consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to Trammell's health and safety.
>
> *Trammell v. Keane*, 338 F.3d at 163.

*Rodriguez v. McGinnis*, 2004 U.S. Dist. LEXIS 13585, at *51-53 (W.D.N.Y. May 18, 2004).

The Medical Defendants have properly supported their motion for summary judgment with

record evidence demonstrating that, on September 11, 2017, Chuzie-McDowell did not act with

the requisite state of mind to be liable for deliberate indifference, but rather acted in a manner

reasonably calculated to insure her safety. Therefore, in order to defeat this motion, Plaintiff is

required to identify evidence that demonstrates the existence of a genuine issue of material fact on

this element of his claim.  He has not done so.  Accordingly, judgment as a matter of law is granted to Chuzie-McDowell on Claim 9.

        3.      Correct Care

Finally, the Medical Defendants assert that Correct Care Solution LLC ("Correct Care") is entitled to judgment because Plaintiff's complaint fails to state any claim against it.  ECF No. 118 at 21-23.  Indeed, when this Court identified all discernible claims presented in Plaintiff's complaint in the opinion on the motions to dismiss filed by the Commonwealth Defendants and the Medical Defendants, no claim against Correct Care was identified.  ECF No. 54 at 8-9.

In response, Plaintiff points to a settlement agreement that Correct Care allegedly entered into with the Disability Rights Network of Pennsylvania in the United States District Court for the Middle District of Pennsylvania, and asserts that Correct Care violated that settlement agreement in the instant case by failing to train prison staff how to deal with mentally ill inmates.  ECF No. 121 at 22-23.  The Court takes judicial notice that Correct Care was not a party to the case Plaintiff cites, *Disability Rights Network of Pennsylvania v. Wetzel*, 1:13-cv-635 (M.D. Pa.).

Having previously found no discernable claim by Plaintiff against Correct Care and Plaintiff having failed to identify any such claim in his response to the motion for summary judgment, Correct Care is entitled to judgment as a matter of law.

        IV.     Conclusion

For the reasons discussed herein, the Commonwealth Defendants' Motion for Summary Judgment, ECF Nos. 107, is DENIED as to Claim 12, and GRANTED in all other respects. Defendant Renberg's Motion for Summary Judgment, ECF No. 111, is GRANTED.  The Medical Defendants' Motion for Summary Judgment, ECF No. 117, is GRANTED.  The case will proceed

against defendants Ruff, Crum, Arnold, and Diraimo on Claim 7, excessive force, and against defendant McClelland on Claim 12, equal protection/racial discrimination.

RICHARD A. LANZILLO
United States Magistrate Judge


Dated: August 11, 2020